No. 806

First Circuit

KNISPEL v. GULF STATES UTILITIES CO., INC.

(June 16, 1931. Opinion and Decree.)
(October 7, 1931. Rehearing Refused.)
(November 30, 1931. Writs of Certiorari and Review Granted by Supreme Court.)
(February 29, 1932. Judgment of Court of Appeal Set Aside and Judgment of District Court Reinstated.)

Cline, Plauche & Girod, of Lake Charles, attorneys for plaintiff, appellee.

Pujo, Bell & Hardin, of Lake Charles, and Thatcher, Browne, Porteous & Myers, of Shreveport, attorneys for defendant, appellant.

ELLIOTT, J. Fred Knispel, an employee of Gulf States Utilities Company, Inc., engaged in the work of a lineman, while removing a cross-arm from a pole which formed one of the supports of its high voltage transmission line, accidentally fell to the ground a distance of about 36 feet, receiving, so he alleges, injuries to his arm, abdomen, pelvis, and right eye, of such character as to produce in him a permanent total disability to do work of any reasonable character.

The accident happened on May 22, 1929. The plaintiff was earning at the time $62.50 per week.

He claims compensation at the rate of $20 per week for a period of 400 weeks, subject to credit for compensation received at the rate of $20 per week from the week beginning May 22, 1929, and ending July 19, 1930.

Defendant admits employment of the plaintiff, that he fell from a pole and was injured as a result of the fall, and the payment of compensation as alleged; but denies owing him any further compensation; alleges it has in fact overpaid him, and prays that his demand be rejected.

For written reasons assigned, there was judgment in the lower court in favor of the plaintiff for 400 weeks, as prayed for. Defendant has appealed.

There is testimony in the record that plaintiff's arm was fractured as a result of the fall and testimony to the contrary. Be that as it may, whatever injury there may have been to the arm it was overcome within a year afterwards, and plaintiff suffers no further injury on that account, except that which exists in his arm as a result of non-use, and for which he is himself responsible.

The injury to his pelvis resulting from the fall is a far more serious matter. According to plaintiff, he had not recovered from this injury at the time of the trial, approximately a year and a half since the fall.

At the time of the trial he professed to be weak and unable to walk a distance greater than a mile without pain on account of it. That he cannot walk up a flight of steps except with difficulty and claims to be unable to pick up any weight at all without it hurting him.

The evidence shows that he was confined in the sanitarium at Lake Charles about two months, due to his injuries; he then went home. At home he was confined a while to his bed and he then got up and for a while used a wheel chair. After a short time he got so he could get about on crutches, was finally able to walk with a cane, and at last did away with the cane, but at the time of the trial, about 18 months from the time of the accident, he still claimed to be unable to do work of any reasonable character, manual labor being the kind referred to, that being the only kind he is qualified to do.

Dr. Holcombe, who treated plaintiff on account of his injuries, speaks of the injury to his pelvis as a multiple fracture and very serious. The plaintiff was under his care for several months. This physi-

cian examined plaintiff the day before the trial and gave it as his opinion that plaintiff could not at that time do hard manual work without getting some pain from his pelvis. His testimony seemingly has reference, however, to the kind of work the plaintiff had formerly done and was doing at the time of his injury, such as climbing poles, adjusting wires—heavy work putting a strain on the region of the pelvis, because he subsequently enumerates several kinds of work that he thought plaintiff could do, but excepted heavy lifting.

The opinion of the doctor is exemplified by the following question and answer:

"Q. Doctor, Mr. Knispel says he has been exercising by walking, at your suggestion and that if he walks a mile his legs and hips give out. Would that be a natural result of his pelvis injury?
"A. Well, of course he may have some pain, Mr. Plauche; it is like all these cases in litigation; they have the personal equation so much that I don't like to treat a man that is in litigation. When litigation is going on of course he is going to come up and complain. I try to get by on a lot of these cases in litigation. It is impossible to treat them until the litigation is over, you can't get by with it."

Subsequently speaking of the pelvis injury, this doctor says:

"I couldn't get any better result from a fracture of the pelvis than this man has.
"Q. Doctor, you first said it was probably permanent—do you mean it is probably permanent or actually permanent?
"A. Well, what I did say, I think this man is going to have some actual pain more or less all his life from a fractured pelvis. I have never seen any fractured pelvis in the amount this man has been fractured, and he will have pain in his pelvis from laborious work."

Mrs. Knispel says that her husband complains, seems to suffer, and, in that way, corroborates him.

Dr. Hatch, chief of the department of diseases and injuries of bones and joints in the Touro Infirmary of New Orleans, and who is no doubt an eminent authority, whose opinion should have great weight, had examined plaintiff on September 30, 1930, which was about a week before the trial. Speaking of the result of his examination he says:

"Patient localizes his pain at just above the right hip joint; he stands with a very slight list to the left. All spinal motions free and painless, except the slightest possible pain on right lateral bending. No pain on raising either extended leg. All motions of both hips, knees and ankles normal. No abdominal tenderness. There is a definite disalignment on the crest of the right ilium and this is a spot in which patient complains of soreness."

The statement continues but we do not quote further.

Dr. Hatch says that he found no pelvis disability at the time, and gave it as his opinion that plaintiff could resume normal labor as a lineman if he would try.

Dr. Gessner, professor of clinical surgery at Tulane University, and well qualified to express an opinion as to plaintiff's condition resulting from the injury in question, had examined plaintiff on November 20, 1929, and again on September 30, 1930. Speaking of his examination on the day last mentioned, he says:

"Q. Is there any present disability in so far as the pelvic injury is concerned?
"A. No."

Further questioned, he says that plaintiff has so far recovered from his pelvic injury, that, in his opinion, he could follow his former employment of lineman, laborer, mechanic, artisan, or other such occupation as he may be mentally qualified to perform, but not at the start; that plaintiff must gradually build up his strength and endurance before he can do work of that kind.

"Q. Doctor, I understand that after a few weeks' exercise he would be physically able to put in a full day's time—is that right?

"A. That is my opinion."

The doctor further says that plaintiff's present condition of disability is the natural result of disease following his injuries; but just when recovery from the pelvic injury may be said to have taken place, there is no certain time that we can fix on, but, from all the evidence on the subject, it seems to be established with reasonable certainty by a preponderance of the evidence that plaintiff's pelvic injury has been overcome, and that he is now well, except some soreness upon lifting heavy weights or doing heavy work, due in turn to his failure, by proper application, to build himself up to endure that kind of work, and that such recovery took place within 100 weeks, counting from time of injury. That no reason exists for disability on his part, as far as the arm and pelvic injuries are concerned, from doing ordinary manual labor of any kind by going about it carefully, building and strengthening himself up to the work. If it had not been for plaintiff's eye trouble, we think he would have returned to his work within the time stated, possibly sooner.

We now come to the injury to plaintiff's eyes. It is upon this ground that the court mainly bases his judgment holding that plaintiff is entitled to compensation for a period of 400 weeks.

Plaintiff does not in the language of the Employers' Liability Act, No. 20 of 1914, sec. 8 (amended by Act No. 242 of 1928) subsection (d) claim "For the loss of an eye" or "For the loss of * * * both eyes." He avers that he "suffered severe injuries to his eyes."

The defendant concludes its answer with the averment that plaintiff "has completely recovered except for the possibility of a slight disability to one eye, which will not be permanent; respondent not admitting that there is any disability of the eye at the present time, said denial being based on the fact that it has not been able to examine plaintiff in some time," etc.

The plaintiff testifies that, upon regaining consciousness after his fall, he discovered that he saw single objects as two, defined in medical dictionaries as diplopia. That he spoke of the matter to Dr. Holcombe, who referred this matter to Drs. Iles and Moss. That at the time of testifying, a year and half since the accident, his eye condition had not improved.

That in walking he is forced to hold his head down in order to see where he is going; by covering his right eye he can see without lowering his head. But he complains that when he covers his right eye the strain placed on his left eye soon causes it to pain him.

Dr. Bahn, of New Orleans, furnished plaintiff with a covering for his right eye, the one out of which he sees double; but he testifies that this covering does not remedy the situation, etc. Plaintiff's complaint and testimony on the subject is in complete variance with that of expert physicians who testify on the subject. It is well known to everybody that if you cover one eye, and there is nothing the matter with the other one, you can see out of it well enough to walk, read, write, or do any of the other things that men ordinarily do. Still we cannot see as well out of one eye as we can when we have the use of both eyes.

Dr. Iles, who had plaintiff under observation on account of his eyes since shortly after the accident until the day before the trial, which was approximately a year and half, says:

"Q. Now, Doctor, why does that affect his ability to see objects?.

"A. Well, he can see objects as good as he ever did, but he sees two. There is nothing wrong with his vision, each eye is normal."

Dr. Iles further says that he never could discover any loss of function in his left eye, mostly in his right eye. That his left eye is not impaired, and that plaintiff can see by covering his right eye; that by covering his right eye he can walk along the street in a normal position, using his left eye.

Dr. Iles gave it as his opinion that the condition of plaintiff's right eye is permanent.

Dr. Moss says:

"Q. Doctor, you agree with Dr. Iles that the left eye is perfectly normal and if the right eye is covered he could see just as well as any one-eyed man would see?

"A. Yes.

"Q. And do the work which any one-eyed man could do?

"A. Yes."

We now come to the testimony of Dr. Bahn of New Orleans. He is undoubtedly well qualified to express an opinion on the subject. He examined plaintiff twice; the first time was in November, 1929, which was about six months after the accident, the next time was September 30th and October 1st and 2d, 1930. He may be in the employment of the defendant, but that fact can hardly have influenced his statements of fact, and we believe his opinions are worthy of the highest regard. There is but little difference between Dr. Bahn and Drs. Iles and Moss, except that Dr. Bahn gave it as his opinion that there is probability in plaintiff's case that his eye trouble will improve in the future, whereas Drs. Iles and Moss do not look for any improvement.

The prospect of improvement seems so uncertain to us that, for the purpose of our decision, we attach no weight to that hope; still, as remarked by the judge a quo, the hope is to be kept in mind, because, certainly, if anything can be done in the future to relieve the situation it must be done.

The physicians say there is nothing the matter with plaintiff's left eye; that the whole trouble is with his right eye. Dr. Bahn says that he provided plaintiff with prismatic glasses at the time of his first examination, and gave it as his opinion that if plaintiff had used these glasses improvement would have taken place. He expresses the opinion that, if plaintiff will use them in future, improvement will take place. Plaintiff testifies that he did use the glasses about six months, and that he can see better without them.

Dr. Holcombe, plaintiff's witness, gives it as his experience that plaintiffs involved in litigation of this kind will not improve until the litigation is over.

The three physicians all join in the statement that, if plaintiff's right eye be covered, he can see out of his left eye as well as any one-eyed man can. Dr. Bahn goes further, and says that he can do any kind of manual labor that can be done by any one-eyed man. And, of course, everybody knows that there are many things a one-eyed man can do very satisfactorily, but there are other things which they cannot do with safety nor accuracy. Dr. Bahn says there is, due to the injury, a loss of 20 per cent of the right eye.

We therefore find that plaintiff is not a total disability; he has not lost the sight of either eye, but, due to paralysis of one of the superior oblique muscles of the right eye, he suffers with diplopia, which impairs the use of both eyes to such an extent that he can do but little, trying to use both eyes. But the trouble can be rem-

edied by the use of a dark prismatic glass for the right eye, as stated by Dr. Bahn, and by doing so plaintiff can do any manual labor which can be done in safety by a one-eyed man, not qualified to do other than manual labor. And to that end we hold that plaintiff must, under the circumstances, avail himself of contrivances necessary to enable him to remedy the diplopia and get the benefit of his uninjured eye, and his compensation must be fixed accordingly.

We find, due to plaintiff's eye trouble, that his compensation must be fixed under the Employers' Liability Act, sec. 8, subsection (d), par. 16 (amended by Act No. 242 of 1928) which provides as follows:

"In cases not falling within any of the provisions already made * * * where the usefulness of a physical function is seriously, permanently impaired, the Court may allow such compensation as is reasonable and as is in proportion to the compensation hereinabove specifically provided in the cases of specific disability, not to exceed sixty-five per centum of wages during one hundred weeks."

As plaintiff received the injury to his arm, pelvis, and eye at the same time in the same accident, we can only allow, under the law in question, but one compensating amount for all his injuries. We find that he is entitled to the full 100 weeks.

For these reasons the judgment appealed from is amended so as to reduce the period of time during which compensation is allowed from 400 weeks to 100 weeks, the 100 weeks to be subject to credit for the weekly payments made at the rate of $20 per week from the week beginning May 22, 1929, and thence weekly until the week commencing July 19, 1930; and, as thus amended and corrected, the judgment appealed from is affirmed. Defendant and appellant to pay the cost in the lower court; appellee, the cost of appeal.